**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | | |
|---|---|---|
| HARRY LOMBARDO, JANICE LOMBARDO, & S. L. (minor), | : | |
| | : | |
| | : | |
| Plaintiffs | : | Civil Action No.: |
| | : | |
| v. | : | |
| | : | |
| SOLVAY SPECIALTY POLYMERS, | : | JURY TRIAL DEMANDED |
| USA, LLC; SOLVAY SOLEXIS, INC.; | : | |
| ARKEMA, INC.; E.I. DU PONT DE | : | |
| NEMOURS & COMPANY; THE | : | |
| CHEMOURS COMPANY; THE | : | |
| CHEMOURS COMPANY FC, LLC; THE | : | |
| 3M COMPANY; and ABC | : | |
| CORPORATIONS #1-10 | : | |
| | : | |
| Defendants | : | |

## COMPLAINT

Now come Plaintiffs, Harry Lombardo, Janice Lombardo, and S. L. (a minor) (collectively "Plaintiffs"), by and through their undersigned counsel, and for their Complaint against Defendants, Solvay Specialty Polymers, USA, LLC, Solvay Solexis, Inc., Arkema, Inc., E.I. du Pont de Nemours & Company, The Chemours Company, The Chemours Company FC, LLC, The 3M Company, and ABC Corporations #1-10 (collectively "Defendants") allege as follows:

## NATURE OF ACTION

1. This is a civil action for compensatory and punitive damages, including medical monitoring and costs incurred and to be incurred by Plaintiffs arising from the intentional, knowing, reckless, and negligent acts and omissions of Defendants, which resulted in the contamination of Plaintiffs' private water supply.  The contamination

1

was caused by the Defendants' intentional manufacturing, use, discharge, and/or disposal of poly- and perfluoroalkyl substances ("PFAS"), including perfluorononanoic acid ("PFNA"), perfluorooctanoic acid ("PFOA"), and perfluorooctanesulfonic acid ("PFOS"), and their replacement compounds, including but not limited to "GenX".

## **PARTIES**

2. Plaintiff Harry Lombardo is an adult citizen of the State of New Jersey domiciled at 625 Swedesboro Road, Gibbstown, NJ 08027.

3. Plaintiff Janice Lombardo is an adult citizen of the State of New Jersey domiciled at 625 Swedesboro Road, Gibbstown, NJ 08027.

4. Plaintiff S. L. is a minor citizen through her natural parents and guardian *ad litems*, Harry and Janice Lombardo, of the State of New Jersey domiciled at 625 Swedesboro Road, Gibbstown, NJ 08027.

5. Based upon representation of counsel, Defendant Solvay Specialty Polymers, USA, LLC ("Solvay USA") is a corporation duly organized under the laws of the State of Delaware with its principal place of business located in Houston, Texas.

6. Based upon representation of counsel, Defendant Solvay Solexis, Inc. ("Solvay Solexis") is the predecessor of Solvay USA and was a corporation duly organized under the laws of the State of Delaware with its principal place of business located in Houston, Texas.

7. Defendants Solvay USA and Solvay Solexis will collectively be referred hereinafter as "Solvay".

2

8. Defendant Arkema, Inc. ("Arkema") is a Pennsylvania corporation with its principal place of business at 2000 Market Street, Philadelphia, PA 19103.

9. Defendant E.I. du Pont de Nemours & Company ("DuPont") is a corporation duly organized under the laws of the State of Delaware with its principal place of business located at 974 Centre Road, Wilmington, DE 19805.

10. Defendant The Chemours Company ("Chemours Co.") is a corporation duly organized under the laws of the State of Delaware with its principle place of business located at 1007 Market Street, Wilmington, DE 19899.

11. Defendant The Chemours Company FC, LLC ("Chemours FC") is a corporation duly organized under the laws of the State of Delaware with its principal place of business located at 1007 Market Street, Wilmington, DE 19899.

12. Defendants Chemours Co. and Chemours FC will collectively be referred hereinafter as "Chemours".

13. Defendant The 3M Company ("3M") is a corporation duly organized under the laws of the State of Minnesota with its principal place of business at 2501 Hudson Road, Maplewood, MN 55144.

14. Defendants ABC Corporations #1-10 are fictitious entities with identities that cannot be ascertained as of the filing of this Complaint, certain of which are corporate successors to, predecessors of, or are otherwise related to, the identified defendants in this matter or which are otherwise liable for the causes of action set forth herein.

## JURISDICTION AND VENUE

15. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 in that none of the Plaintiffs are domiciled in the same state as any Defendant, and the amount in controversy exceeds $75,000.

16. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) since a substantial part of the events or omissions giving rise to the claim occurred in this district.

## STATEMENT OF FACTS

### I.    Poly- and perfluoroalkyl Substances ("PFAS")

17. Poly- and perfluoroalkyl substances ("PFAS") are man-made chemicals manufactured and used in the United States since the 1940s.

18. PFAS have fire-resistant properties and act as oil, grease, and water repellants.

19. They have been used to make numerous household products like Stainmaster®, Scotchgard®, Teflon®, Gore-Tex® and Tyvek®.

20. They have long been used in aqueous film-forming foam used to fight fires.

21. There are literally thousands of PFAS compounds including perfluorononanoic acid ("PFNA"), perfluorooctanoic acid ("PFOA"), and perfluorooctanesulfonic acid ("PFOS").

22. 3M has been identified by the United States Environmental Protection Agency ("EPA") as the dominant global producer of PFOA and related chemicals manufacturing at least 85% of total worldwide volumes.

23. PFAS compounds constitute a substantial threat to human health and the environment.

24. Some PFAS are classified as carcinogenic.

25. Studies show that exposure to PFAS may cause testicular cancer, kidney cancer, liver cancer, autoimmune disorders, endocrine disorders, developmental defects to fetuses during pregnancy, developmental defects to breastfed babies, reduced vaccine response, increased cholesterol, and increased liver enzymes.

26. PFAS compounds are extremely resistant to degradation and thus persist indefinitely in the environment.

27. PFAS compounds bioaccumulate resulting in the buildup of these toxins in living tissue.

28. People who consume these substances through drinking water and other means accumulate increasing concentrations of PFAS in their blood.

29. Defendants and their predecessors in interest have understood the toxic characteristics of PFAS for decades.

30. Regulatory agencies around the world are only just beginning to understand the true nature and dangers of these contaminants.

31. The New Jersey Department of Environmental Protection ("NJDEP") has and is continuing to expend tremendous resources to identify and investigate the presence of PFAS in New Jersey's environment, as well as monitor, treat, clean up, and/or remove PFAS in impacted areas.

32. Replacement chemicals including but not limited to "GenX" have been substituted by Defendants in place of their PFAS chemicals.

33. These replacement chemicals are being touted as short-chain and having shorter half-lives.

34. However, these replacement chemicals may have similar toxicity.

35. These replacement chemicals do not break down in the environment and have also been detected in drinking water, groundwater and surface waters.

36. EPA has identified PFAS as "emerging contaminants," which are currently unregulated at the federal level.

37. In 2009, EPA issued preliminary health advisory values for PFOA and PFOS in drinking water of 400 parts per trillion ("ppt") and 200 ppt, respectively.

38. In 2016, EPA reduced its advisories for PFOA and PFOS to 70 ppt collectively total.

39. In 2018 the United States Department of Health and Human Services, Agency for Toxic Substances and Disease Registry ("ATSDR") released draft minimum risk levels (the amount of a chemical a person can eat, drink, and breath each day without a detectable health risk) of 21 ppt for PFOA and PFNA, and 14 ppt for PFOS.

40. NJDEP has adopted a specific groundwater Quality Standard ("GWQS") of 10 ppt for PFNA and a Maximum Contaminant Level ("MCL") of 13 ppt.

41. NJDEP added PFNA to its List of Hazardous Substances on January 16, 2018.

42. On March 13, 2019, the NJDEP established interim specific groundwater quality criteria for PFOA and PFOS of 10 ppt.

43. NJDEP has proposed adding PFOA and PFOS to the List of Hazardous Substances.

44. NJDEP also issued a Statewide PFAS Directive, Information Request and Notice to Insurers against Defendant Solvay Specialty Polymers USA, LCC, Defendant Solvay Solexis, Inc., Defendant E.I. du Pont de Nemours & Company, Dowdupont, Inc., DuPont Specialty Products USA, LLC, Defendant The Chemours Company FC, LLC, Defendant The Chemours Company, and Defendant The 3M Company "to notify them that the Department believes them to be responsible for the significant contamination of New Jersey's natural resources, including the air and waters of the State, with poly- and perfluoroalkyl substances ("PFAS")…" which encompass the air and water utilized by plaintiffs.  Attached hereto as Exhibit A is a true and correct copy of the NJDEP Directive.

## II.   Solvay and Arkema's West Deptford Facility

45. Solvay has been the owner and operator of a manufacturing facility located at 10 Leonard Lane, West Deptford, NJ 08085 from 1990 to present.

46. Arkema owned and operated the West Deptford facility prior to 1990.

47. From approximately 1990 to 2012, Solvay manufactured polyvinylidene fluoride ("PVDF") at this facility, which is a specialty plastic that is utilized in conjunction with lithium batteries, medical and defense uses, semi-conductors, or other instances when a higher level of purity is required.

48. Upon information and belief, Arkema manufactured PVDF and other high-performance materials at the West Deptford facility prior to 1990.

49. Solvay's West Deptford facility was considered to have the second highest capacity in the world for purposes of using Surflon S-11 to make PVDF, which is composed of approximately 74% PFNA.

50. As a result of their operations, Solvay released massive amounts of PFNA into the surrounding air and water contaminating the site, off-site properties including Plaintiffs', and New Jersey's natural resources with the PFNA chemical.

51. Solvay also used sodium perfluorooctanoate (NaPFO) as a surfactant at the West Deptford Facility, which was supplied to them by 3M.

52. NaPFO degrades into PFOA.

53. As a result of their operations, Solvay released massive amounts of PFOA into the surrounding air and water contaminating the site, off-site properties including Plaintiffs', and New Jersey's natural resources with the PFOA chemical.

7

54. Prior to 1990, as a result of their operations, Arkema released massive amounts of PFOA into the surrounding air and water contaminating the site, off-site properties including Plaintiffs', and New Jersey's natural resources with the PFOA chemical.

III.   **DuPont and Chemours' Chamber's Works Facility**

55. DuPont owned and operated Chambers Works, 67 Canal Road and Route 130, located in Pennsville and Carneys Point Townships, New Jersey from 1891 to 2015.

56. DuPont produced, utilized, and discharged into the environment approximately 1,200 chemicals, pollutants, and other hazardous substances from the Chambers Works facility.

57. PFOA was used at Chambers Works beginning in the late 1950s to, among other things, manufacture fluoroelastomers, perfluoroelastomers and specialty fluoroelastomers used in a variety of consumer and other products for their chemical non-stick and heat-resistant properties.

58. Telomers were also used and manufactured at Chambers Works.  PFOA is a by-product of the telomer manufacturing process.

59. 3M supplied DuPont with PFOA.

60. DuPont also accepted large quantities of PFOA-containing waste from off-site facilities and discharged this waste along with wastewater from its on-site PFOA-related processes through its wastewater treatment plant.

61. As a result of their operations, DuPont released massive amounts of PFOA as well as other PFAS, including PFNA, from Chambers Works for decades into the surrounding air and water contaminating the site, off-site properties including Plaintiffs', and New Jersey's natural resources.

62. In 2015, DuPont transferred its Chambers Works facility to Chemours, but continued to operate at the location pursuant to an industrial lease (whereby DuPont was the tenant and Chemours FC was the landlord).

63. Chemours accepted the transfer of DuPont's Chambers Works facility knowing that the site was contaminated with PFAS and that it was discharging PFAS into the surrounding air and water contaminating off-site properties including Plaintiffs', and New Jersey's natural resources.

64. Sampling of residential drinking water wells in the surrounding area revealed contamination at least five miles away from the Chambers Works facility with 168 out of 341 wells exceeding applicable screening criteria for concentrations of PFOA, PFNA, or PFOA and PFOS combined.

65. NJDEP recently declared that:

> "it has recently become clear that DuPont has not been working in good faith to address the contamination it released into New Jersey's environment. Instead DuPont knowingly concealed the true nature of the chemicals it discharged, while simultaneously moving forward with a corporate reorganization that moved its 'performance chemicals' business (including its PFAS-related product lines), the [Chambers Works facility] itself, and the associated liabilities to Chemours [Co.] and Chemours FC and away from DuPont (and tens of billions of dollars of its assets). DuPont has concealed from the Department and the community the extent and nature of the environmental injuries its contaminants caused."

66. NJDEP further alleges that by doing so "[b]oth DuPont and The 3M Company ("3M") put their profits above the public health, safety, and the environment of New Jersey."

67. DuPont and 3M committed acts and omissions with respect to PFAS with actual malice and/or with a wanton and willful disregard of persons who foreseeably might be harmed by those acts or omissions.

68. Such conduct was performed to promote sales of their products and to reduce or eliminate expenses they would have otherwise incurred to remediate the discharge of PFAS into the environment and Plaintiffs' private wells.

## IV. **Defendants' Contamination of Groundwater and Drinking Water**

69. Defendants knew or should have known of the health and environmental impacts of PFAS for decades but continued to use them in products and release them into the environment.

70. Defendant 3M knew that PFOA and PFOS were harmful to people and the environment based on its own studies from as early as the 1970s.

71. Defendant 3M knew that PFAS could leach in groundwater and contaminate the environment.

72. As early as 1960 an internal 3M memo admitted to understanding that its chemicals "[would] eventually reach the water table and pollute domestic wells."

73. 3M actively sought to suppress scientific research on the hazards associated with PFAS products and mounted a campaign to control the scientific dialogue on the exposure, analytical, fate, effects, human health, and economical risks of its PFAS products.

74. At least one scientist funded by 3M reported his goal as "keep[ing] 'bad' papers [regarding PFAS] out of the literature" because "in litigation situations" those articles "can be a large obstacle to refute."

75. Defendants DuPont knew that PFOA was toxic to people from studies of its own workers.

76. Defendants DuPont knew that PFOA was being discharged into the environmental but failed to disclose the risks to regulators or the public.

77. In a 2003 report on Chambers Works, DuPont disclosed that PFOA was present in groundwater throughout the facility and at the perimeter up to 46,000 ppt but characterized those results as showing "very low levels" and that "PFOA is being contained on-site by the site groundwater containment system."

78. Defendants Solvay knew that it was discharging large amounts of PFNA into the environment from their West Deptford, New Jersey facility located at 10 Leonard Lane, West Deptford, NJ 08086 since at least 1991.

79. In 2006, the NJDEP conducted its first statewide occurrence study of PFAS in drinking water, which revealed 65% of sampled drinking water sources having PFOA compounds present, and 30% having PFOS compounds present.

80. In 2009-2010, a second study involving 20 out of New Jersey's 21 counties revealed 70% of sampled drinking water sources having between one to eight PFAS compounds. In the samples tested, PFOA was detected up to 100 ppt, PFOS was detected up to 43 ppt, and PFNA was detected up to 96 ppt.

81. NJDEP sampled 992 private wells as of June 2018 for PFAS and detected the following:

    a. PFOA in 427 wells (43%) with 284 of those wells having levels of PFOA exceeding the proposed MCL for PFOA; and

    b. PFOS in 304 wells (31%) with 40 of those wells having levels of PFOS exceeding the proposed MCL for PFOS.

11

82. 400 of those sampled wells were sampled as part of the remedial investigation emanating from Solvay's West Deptford facility.

83. Out of those 400 sampled wells, 83 wells (21%) required the installation of a point of entry treatment ("POET") system for PFNA or PFOA.

84. Plaintiffs in this action are part of the 21% of private wells requiring installation of a POET system due to detection of high concentrations of PFAS in their private water well.

85. Plaintiffs had their private well tested on or about January 22, 2015. The results yielded a concentration of 13 ppt of PFOA, 24 ppt of PFNA, and 1 ppt of PFOS.

86. Plaintiffs' POET system was installed in 2015.

87. A sample of treated water was taken on October 7, 2015. The results yielded a concentration of 7.8 ppt of PFOA, 12 ppt of PFNA, and 0.21 ppt of PFOS.

88. A sample of treated water was taken on January 23, 2020. The results yielded levels of 27.9 ppt of PFOA, 42.4 ppt of PFNA, and 3.17 ppt of PFOS.

89. The levels of PFNA and PFOA detected even after treatment were both above their respective standards, which prompted a carbon change to their POET system.

90. All Plaintiffs in this action have consumed, ingested, and otherwise been exposed to high concentrations of PFAS due to Defendants' negligent, careless, wrongful, reckless and/or intentional failure to take appropriate steps to prevent and/or reduce the discharge of PFAS into Plaintiff's drinking water.

91. Due to the bioaccumulation properties alleged in the aforementioned paragraphs, all Plaintiffs are likely to have accumulated high levels of PFAS in their blood as a result of their long periods of exposure to high concentration of PFAS.

92. All Plaintiffs in this action are at risk for serious physical injuries and diseases related to their consumption, ingestion, and exposure to elevated levels of PFAS.

93. Studies show that exposure to PFAS may cause testicular cancer, kidney cancer, liver cancer, autoimmune disorders, endocrine disorders, developmental defects to fetuses during pregnancy, developmental defects to breastfed babies, reduced vaccine response, increased cholesterol, and increased liver enzymes.

94. Plaintiffs' increased risk of serious physical injuries and diseases make it reasonably necessary for Plaintiffs to undergo periodic diagnostic medical examinations, including blood testing, different from what would be prescribed in the absence of such exposure.

95. Monitoring procedures exist that make possible the early detection of the latent diseases and other harms referred to in the aforementioned paragraphs.  These procedures necessarily include blood draws and analysis in order to gage the levels of PFAS in Plaintiffs' bodies.

96. The contamination of Plaintiffs' private wells has also severely disrupted their lives.

97. They have and will continue to incur substantial costs for bottled water in order to reduce their exposure to the contaminants in their water supply.

98. They have and will be subjected to annoyance, inconvenience and distress in having to make repeated trips to pick up bottled water and use bottled water instead of tap water for such ordinary tasks as cooking, brewing coffee and tea, brushing their teeth, watering their vegetable gardens, and feeding pets.

99. They have and will be subjected to annoyance, inconvenience and distress in having to install and maintain a POET system to treat their contaminated private wells.

100. Plaintiffs' properties which they own have also significant diminished in value.

## CLAIMS

### Count I: Negligence
### Plaintiffs v. All Defendants

101. Plaintiffs incorporate the allegations contained in all preceding paragraphs as if fully restated herein.

102. Defendants knew or should have known that use of PFAS and/or discharge of PFAS into the groundwater and drinking water was hazardous to human health and the environment.

103. Defendants further knew or should have known that it was unsafe and/or unreasonably dangerous to discharge PFAS chemicals into the environment in close proximity to surrounding residential communities, including Plaintiffs'.

104. Defendants DuPont, Chemours, Solvay, Arkema, and ABC Corporations #1-10 had a duty to take all reasonable measures to ensure that PFAS would be effectively contained and not discharged into the surrounding environment.

105. Defendants DuPont, Chemours, Solvay, Arkema, and ABC Corporations #1-10 had a duty to operate and manage their facilities and its related wastes in such a way as to not create a nuisance or dangerous condition that could cause injury or damage to human health and the environment.

106. Defendants DuPont, Chemours, Solvay, Arkema, and ABC Corporations #1-10 further had a duty to ensure that the manufacturing processes they chose to employ did not unreasonably endanger the drinking water relied upon by residents in the surrounding community, including Plaintiffs.

107. Defendants DuPont, Chemours, Solvay, Arkema, and ABC Corporations #1-10 breached the above-stated duties by unreasonably disposing PFAS in a manner that guaranteed it would enter the environment, specifically but not limited to the groundwater, exposing nearby residents who relied upon the groundwater for their drinking water supply, including Plaintiffs.

108. Defendant 3M had a duty to warn users of their PFAS products of the dangers of releasing PFAS into the environment.

109. Defendant 3M breached the above-stated duty by failing to adequately warn and provide sufficient instructions to purchasers such as Defendants Solvay, Arkema, DuPont, Chemours, and ABC Corporations #1-10, to avoid discharging PFAS into the environment where it was likely to enter groundwater and be ingested by residents in surrounding communities, including Plaintiffs.

110. As a direct and proximate result of these acts and omission, Defendants contaminated the environment with PFAS, thereby exposing Plaintiffs to these chemicals, and causing injury to them.

111. All Defendants contributed to the contamination of the environment with PFAS, and all subsequently contributed to Plaintiffs' exposure to these chemicals, thereby causing injury to them.

112. The acts and omissions of Defendants were negligent, and as a result, Plaintiffs have suffered and/or will in the future suffer damage in the form of bodily injury, emotional distress, and/or property damage, all of a type not common to the general public, for which Defendants are liable, including, liability for all medical monitoring relief required and requested by Plaintiffs.

WHEREFORE, Plaintiffs request that this Court enter judgment against Defendants for compensatory and non-compensatory damages, together with interest, costs, attorneys' fees, medical monitoring, and all such other relief as the Court deems proper.

<u>**Count II: Gross Negligence**</u>
<u>**Plaintiffs v. All Defendants**</u>

113. Plaintiffs incorporate the allegations contained in all preceding paragraphs as if fully restated herein.

114. At all relevant times, Defendants, as detailed above, committed acts and omissions with respect to PFAS with actual malice and/or with a wanton and willful disregard of persons who foreseeably might be harmed by those acts or omissions.

115. Specifically, Defendants caused, permitted, and allowed the release of PFAS into the environment, thereby contaminating the drinking water of Plaintiffs, constituting an entire want of care and a conscious indifference to the rights, welfare, safety, and health of Plaintiffs, such that Defendants' acts constitute gross negligence or reckless, willful or wanton misconduct.

116. Such conduct was performed to promote sales of their products and to reduce or eliminate expenses they would have otherwise incurred to remediate the discharge of PFAS into the environment and Plaintiffs' private wells.

117. Defendants' grossly negligent conduct proximately caused and continues to proximately cause damage to Plaintiffs in the form of bodily injury (including, but not limited to blood and/or bodily contamination via PFAS and/or other human illnesses or diseases) and property damage, in addition to creating conditions harmful to human health and the environment.

118. All Defendants contributed to the contamination of the environment with PFAS, and all subsequently contributed to Plaintiffs' exposure to these chemicals, thereby causing injury to them.

119. Defendants' conduct involved deliberate acts or omissions with knowledge of a high degree of probability of harm to the Plaintiffs and an attendant reckless indifference to their health, safety, and welfare.

120. Defendants' conduct demonstrated a willful and wanton, malicious and reckless disregard of the rights of Plaintiffs so as to warrant the imposition of punitive damages.

WHEREFORE, Plaintiffs request that this Court enter judgment against Defendants for compensatory and non-compensatory damages, and punitive damages, together with interest, costs, attorneys' fees, medical monitoring, and all such other relief as the Court deems proper.

### Count III: Private Nuisance
### Plaintiffs v. Solvay, Arkema, DuPont, & Chemours

121. Plaintiffs incorporate the allegations contained in all preceding paragraphs as if fully restated herein.

122. Defendants acts and omissions with respect to the release of PFAS in the environment resulted in the contamination of Plaintiffs' private water supply, and have thus unreasonably interfered with Plaintiffs' use and enjoyment of their property, invading Plaintiffs' homes and bodies, making Plaintiffs' water supply unfit for consumption and other domestic purposes, and placing Plaintiffs at an increased risk of developing serious latent diseases and conditions.

123. The contamination of Plaintiffs' private wells has materially diminished the value of their properties.

124. Defendants' unreasonable interference with the use and enjoyment of Plaintiffs' properties constitute a continuous invasion of their property rights.

125. As a direct and proximate result of the acts and omissions of Defendants as alleged in this Complaint, Plaintiffs have incurred and will incur in the future, annoyance and inconvenience as well as costs and expenses related to the investigation, treatment, remediation, and monitoring of drinking water and the contamination of their properties, as well as other damaged alleged herein.

126. Defendants, Solvay, Arkema, Dupont and Chemours all contributed to the contamination of the environment with PFAS, and all subsequently contributed to the private nuisance imposed on Plaintiffs.

127. Defendants' creation of a continuing private nuisance has damaged Plaintiffs in the form of bodily injury, emotional distress, and/or property damage all of a type not common to the general public, for which Defendants are liable, including liability for all appropriate medical monitoring relief required by Plaintiffs.

WHEREFORE, Plaintiffs request that this Court enter judgment against Defendants for compensatory and non-compensatory damages, together with interest, costs, attorneys' fees, medical monitoring, and all such other relief as the Court deems proper.

## <u>Count IV: Past and Continuing Trespass</u><br><u>Plaintiffs v. Solvay, Arkema, DuPont, & Chemours</u>

128. Plaintiffs incorporate the allegations contained in all preceding paragraphs as if fully restated herein.

129. Plaintiffs are owners and/or residents of real property with the right of possession.

130. Defendants negligently, recklessly, and/or intentionally failed to properly control, apply, use and/or dispose of PFAS resulting in its discharge into the environment entering,

invading, intruding, and injuring the rights of Plaintiffs to possess and enjoy their properties.

131. Plaintiffs have not consented and do not consent to the contamination alleged herein, and Defendants knew or reasonably should have known that Plaintiffs would not consent to such.

132. Defendants, Solvay, Arkema, Dupont and Chemours all contributed to the contamination of the environment with PFAS, and all subsequently contributed to the past and continuing trespass imposed on Plaintiffs.

133. As a direct and proximate result of Defendants' acts and omissions as alleged herein, the soil and drinking water wells on Plaintiffs' properties have been contaminated with PFAS, causing significant property damage, including actual, consequential, and nominal damages.

WHEREFORE, Plaintiffs request that this Court enter judgment against Defendants for compensatory and non-compensatory damages, together with interest, costs, attorneys' fees, medical monitoring, and all such other relief as the Court deems proper.

## Count V: Spill Act
## Plaintiffs v. All Defendants

134. Plaintiffs incorporate the allegations contained in all preceding paragraphs as if fully restated herein.

135. Defendant Solvay USA is a "person" within the meaning of N.J.S.A. § 58:10-23.11b.

136. Defendant Solvay Solexis is a "person" within the meaning of N.J.S.A. § 58:10-23.11b.

137. Defendant Arkema is a "person" within the meaning of N.J.S.A. § 58:10-23.11b.

138. Defendant DuPont is a "person" within the meaning of N.J.S.A. § 58:10-23.11b.

139. Defendant Chemours Co. is a "person" within the meaning of N.J.S.A. § 58:10-23.11b.

140. Defendant Chemours FC is a "person" within the meaning of N.J.S.A. § 58:10-23.11b.

141. Defendant 3M is a "person" within the meaning of N.J.S.A. § 58:10-23.11b.

142. Defendants ABC Corporations #1-10 are "persons" within the meaning of N.J.S.A. § 58:10-23.11b.

143. The discharge of hazardous substances is prohibited pursuant to N.J.S.A. § 58:10-23.11c.

144. The contaminants discharged from the West Deptford facility and Chambers Works are hazardous substances as defined in N.J.S.A. § 58:10-23.11b.

145. A person who has discharged a hazardous substance or is in any way responsible for any hazardous substance, shall be strictly liable, jointly and severally, without regard to fault, for all cleanup and removal costs no matter by whom incurred. N.J.S.A. § 58:10-23.11g.

146. Whenever one or more dischargers or persons cleans up and removes a discharge of a hazardous substance, those dischargers and persons shall have a right of contribution against all other dischargers and persons in any way responsible for a discharged hazardous substance or other persons who are liable for the cost of the cleanup and removal of that discharge of a hazardous substance.  N.J.S.A. § 58:10-23.11f(a)(2)(a).

147. Plaintiffs have incurred, and will continue to incur, costs and damages associated with the discharges of the aforementioned sites and which are "cleanup and removal costs" within the meaning of N.J.S.A. § 58:10-23.11b including but not limited to restoration of a clean water supply and/or providing them with access to an alternate water source.

148. Defendant Solvay USA as owners and operators of the West Deptford facility at the time the hazardous substances were discharged are liable, jointly and severally, without

regard to fault, for all clean up and removal costs and damages Plaintiffs have incurred or will incur as a result of hazardous substances at their facility.

149. Defendant Solvay Solexis as owners and operators of the West Deptford facility at the time the hazardous substances were discharged are liable, jointly and severally, without regard to fault, for all clean up and removal costs and damages Plaintiffs have incurred or will incur as a result of hazardous substances at their facility.

150. Defendant Arkema as owners and operators of the West Deptford facility at the time the hazardous substances were discharged are liable, jointly and severally, without regard to fault, for all clean up and removal costs and damages Plaintiffs have incurred or will incur as a result of hazardous substances at their facility.

151. Defendant DuPont as owners and operators of the Chambers Works facility at the time the hazardous substances were discharged are liable, jointly and severally, without regard to fault, for all clean up and removal costs and damages Plaintiffs have incurred or will incur as a result of hazardous substances at their facility.

152. Defendant Chemours Co. as owners and operators of the Chambers Works facility at the time the hazardous substances were discharged are liable, jointly and severally, without regard to fault, for all clean up and removal costs and damages Plaintiffs have incurred or will incur as a result of hazardous substances at their facility.

153. Defendant Chemours FC as owners and operators of the Chambers Works facility at the time the hazardous substances were discharged are liable, jointly and severally, without regard to fault, for all clean up and removal costs and damages Plaintiffs have incurred or will incur as a result of hazardous substances at their facility.

154. Defendant 3M as manufacturers and suppliers of the hazardous substances discharged at the West Deptford and Chambers Works facilities, are liable, jointly and severally, without regard to fault, for all clean up and removal costs and damages Plaintiffs have incurred or will incur as a result of their hazardous substance products.

155. Defendants ABC Corporations #1-10 as the owners and/or operators of the West Deptford and Chambers Works facilities, and/or the manufacturers and/or suppliers of the hazardous substance products are liable, jointly and severally, without regard to fault, for all clean up and removal costs and damages Plaintiffs have incurred or will incur as a result of their hazardous substances at their facility and/or hazardous substance products.

156. As a direct or indirect result of the violations set forth above, Plaintiffs have incurred and will incur in the future substantial costs related to the restoration of a clean water supply and/or access to an alternate water source.

WHEREFORE, Plaintiffs request that this Court enter judgment against Defendants for all damages compensable under the laws of this state, including removal of the discharged hazardous substances and compelling Defendants to pay for the costs of providing Plaintiffs with a water supply free of hazardous contamination along with counsel fees and costs.

**Count VI: Strict Liability (Abnormally Dangerous Activities)**
**Plaintiffs v. Solvay, Arkema, DuPont, Chemours and ABC Corporations #1-10**

157. Plaintiffs incorporate the allegations contained in all preceding paragraphs as if fully restated herein.

158. At all relevant times, Defendants Solvay, Arkema, DuPont, Chemours, and ABC Corporations #1-10 disposed of, discharged, and emitted hazardous substances from their facilities which they owned, controlled, and operated.

22

159. As a result of Defendants Solvay, Arkema, DuPont, Chemours and ABC Corporations #1-10 discharging such substances from their sites, the groundwater was contaminated with hazardous substances, creating a risk of harm to Plaintiffs as well as the surrounding community.

160. The manufacturing, utilization, disposal, and discharge of PFAS chemicals constitute abnormally dangerous activities that introduce an unusual danger in the community.

161. These activities presented a high likelihood that the harm they would cause would be great.

162. The manufacturing, utilization, disposal, and discharge of these products are not matters of common usage in the areas where these activities were carried out.

163. At all relevant times, the risk of the Defendants abnormally dangerous activities outweighed the value to the community.

164. Defendants acts and omissions in manufacturing, utilizing, disposing, and discharging hazardous chemicals proximately caused the contamination to Plaintiffs' properties, making them strictly liable for the harm caused by such contamination.

165. Defendants Solvay, Arkema, Dupont, and Chemours all contributed to the contamination of the environment with PFAS, and all subsequently contributed to Plaintiffs' exposure to these chemicals, thereby causing injury to them.

166. As a direct and proximate result of Defendants discharges of hazardous substances and contaminants, Plaintiffs have and will continue to suffer damages, including but not limited to interference with the use and enjoyment of their properties, inconvenience, diminution in property value, deprivation of a clean water supply, and exposure to hazardous chemicals increasing the risk of disease and illness, among other damages.

23

WHEREFORE, Plaintiffs request that this Court enter judgment against Defendants for compensatory and non-compensatory damages, together with interest, costs, attorneys' fees, medical monitoring, and all such other relief as the Court deems proper.

### Count VII: Strict Liability (Failure to Warn)
### Plaintiffs v. 3M

167. Plaintiffs incorporate the allegations contained in all preceding paragraphs as if fully restated herein.

168. Defendant 3M developed, tested, assembled, manufactured, packaged, labeled, prepared, distributed, marketed, and/or supplied PFAS products for sale and sold such products to Defendants DuPont, Chemours, Solvay, Arkema, and ABC Corporations #1-10 in the ordinary course of their businesses.

169. Upon information and belief, Defendants DuPont, Chemours, Solvay, Arkema, and ABC Corporations #1-10 utilized the PFAS chemicals supplied by Defendant 3M in a reasonably foreseeable and intended manner and for such products' intended uses.

170. The PFAS products sold by Defendant 3M were unreasonably dangerous to residents of surrounding communities, including Plaintiffs, without adequate warnings and instructions to prevent discharge of PFAS into the environment and accumulation inside the bodies of residents in surrounding communities, including Plaintiffs.

171. Defendant 3M knew or should have known that the PFAS products they sold would be discharged into the environment and cause contamination of the water supply of and accumulation in the blood serum of residents living in the surrounding communities, including Plaintiffs.

172. Defendant 3M failed to advise Defendants Solvay, Arkema, DuPont, Chemours, and ABC Corporations #1-10 which were purchasers and users of their PFAS products about

the risks their PFAS products posed to foreseeable third parties, such as Plaintiffs, and about techniques that could be employed to reduce these risks.

173. Defendant 3M had actual knowledge of the health hazards associated with PFAS exposure through both animal studies conducted by researchers employed or contracted by such Defendants and though experience with Defendant's own workers, but, upon information and belief, failed to share such information with purchasers of their products, including Defendants DuPont, Chemours, Solvay, Arkema, and ABC Corporations #1-10, or with governmental agencies.

174. Defendant 3M acted with reckless indifference to the health and safety of residents in surrounding communities where its PFAS products were used by failing to provide adequate warnings of the known dangers of such products when discharged into the environment and ingested by nearby residents, such as Plaintiffs.

175. Defendant 3M had a duty to warn users of their PFAS products of the dangers of releasing PFAS into the environment.

176. Defendant 3M breached the above-stated duty by failing to adequately warn and provide sufficient instructions to purchasers such as Defendants Solvay, Arkema, DuPont, Chemours, and ABC Corporations #1-10, to avoid discharging PFAS into the environment where it was likely to enter groundwater and be ingested by residents in surrounding communities, including Plaintiffs.

177. As a direct and proximate result of Defendant 3M's acts and omissions, Plaintiffs have and will continue to suffer damages, including but not limited to interference with the use and enjoyment of their properties, inconvenience, diminution in property value,

deprivation of a clean water supply, and exposure to hazardous chemicals increasing the risk of disease and illness, among other damages.

WHEREFORE, Plaintiffs request that this Court enter judgment against Defendant for compensatory and non-compensatory damages, together with interest, costs, attorneys' fees, medical monitoring, and all such other relief as the Court deems proper.

## Count VIII: Strict Liability (Defective Design)
## Plaintiffs v. 3M

178. Plaintiffs incorporate the allegations contained in all preceding paragraphs as if fully restated herein.

179. Defendant 3M designed, manufactured, and sold PFAS that were used at the Chambers Works and West Deptford facilities by Defendants DuPont, Chemours, Solvay, Arkema, and ABC Corporations #1-10.

180. As a manufacturer and seller of PFAS, Defendant 3M had a duty to make and sell products that are reasonably fit, suitable, and safe for their intended or reasonably foreseeable uses.

181. Defendant 3M owed that duty to direct users of its products, to reasonably foreseeable users of its products, and also to any person who might reasonably be expected to come into contact with these products, such as Plaintiffs.

182. Defendant 3M's PFAS products were used in a reasonably foreseeable manner and without substantial change in the condition of such products and were defective and unfit for their reasonable use.

183. Defendant 3M knew or should have known that use of its PFAS products by Defendants DuPont, Chemours, Solvay, Arkema, and ABC Corporations #1-10 would result in the spillage, discharge, and/or release of PFAS into the environment and would contaminate

the groundwater and drinking water of surrounding communities, including Plaintiffs'. Accordingly, Defendant 3M knew or should have known that its PFAS products would eventually come into contact with residents in surrounding communities, including Plaintiffs.

184. Defendant 3M's PFAS products were defective in design and unreasonable dangerous because, among other things:

    a.  PFAS cause extensive and persistent contamination when used in a reasonably foreseeable and intended manner; and

    b.  PFAS contamination in the environment and groundwater, which are the sources of drinking water to citizens in the surrounding communities, including Plaintiffs, poses significant threats to their health, safety, and welfare.

185. At all relevant times, Defendant 3M's PFAS products which they designed, manufactured, and sold were dangerous to an extent beyond that which would be contemplated by the ordinary consumer.

186. The foreseeable risk to public health and welfare, including that of Plaintiffs', posed by Defendant 3M's PFAS products outweighed the cost to Defendant 3M of reducing or eliminating such risk.

187. Defendant 3M knew or should have know about reasonably safer and feasible alternatives to PFAS.

188. As a direct and proximate result of Defendant 3M's acts and omissions, Plaintiffs have and will continue to suffer damages, including but not limited to interference with the use and enjoyment of their properties, inconvenience, diminution in property value,

deprivation of a clean water supply, and exposure to hazardous chemicals increasing the risk of disease and illness, among other damages.

WHEREFORE, Plaintiffs request that this Court enter judgment against Defendant for compensatory and non-compensatory damages, together with interest, costs, attorneys' fees, medical monitoring, and all such other relief as the Court deems proper.

### Count IX: Punitive Damages
### Plaintiffs v. All Defendants

189. Plaintiffs incorporate the allegations contained in all preceding paragraphs as if fully restated herein.

190. At all material times hereto, Defendants knew or should have known that their PFAS chemicals could leach into groundwater and contaminate the drinking water of residents in surrounding communities, including Plaintiffs.

191. At all material times hereto, Defendants knew or should have known that PFAS were hazardous substances and the reckless, and/or wanton and willful discharge of those chemicals into the environment and surrounding communities would eventually reach Plaintiffs' drinking water wells thus exposing them to high concentrations of the hazardous chemicals.

192. At all material times hereto, Defendants knew or should have known of the health and environmental impacts of PFAS for decades but continued to use them in products and release them into the environment.

193. At all material times hereto, Defendants knew that PFOA and PFOS were harmful to people and the environment based on its own studies.

194. At all material times hereto, despite actual or constructive knowledge of its chemicals' toxicity to humans and the environment, Defendants proactively sought to conceal that information from the public.

195. At all material times hereto, despite actual or constructive knowledge of its chemicals' toxicity to humans and the environment, Defendants proactively misrepresented the chemicals' hazardous properties, including knowingly and purposefully withholding material information from regulators and governmental agencies.

196. At all material times hereto, even after Defendants acquired actual knowledge that it was causing groundwater and drinking water contamination and thus exposing nearby residents to its PFAS chemicals, including Plaintiffs, Defendants continued their operations and continued discharging the hazardous chemicals into the environment and exposing residents in surrounding communities, including Plaintiffs, in reckless and conscious disregard for the serious health and safety risks associated with such exposure.

197. At all material times hereto, Defendants committed acts and omissions with respect to PFAS with actual malice and/or with a wanton and willful disregard of persons who foreseeably might be harmed by those acts or omissions.

198. At all material times hereto, Defendants knowingly, continuously, and with conscious indifference to the rights of residents in surrounding communities, including Plaintiffs, to have access to clean drinking water, caused, allowed, or permitted the discharge of large quantities of PFAS into the environment and groundwater, had no justification for doing so, and made no significant effort to alleviate the problem.

199. Such conduct was performed to promote sales of their products, maximize profits, and to reduce or eliminate expenses they would have otherwise incurred to remediate the discharge of PFAS into the environment and Plaintiffs' private wells.

200. Defendants' acts and omissions as set forth in the preceding paragraphs demonstrate their corporate disposition to recklessly and consciously disregard the health, safety, and welfare of residents in the community, including Plaintiffs.

201. As a direct and proximate result of Defendants conscious and deliberate disregard for the health, safety, and welfare of residents in surrounding communities, including Plaintiffs, Plaintiffs suffered and continue to suffer severe and permanent damages, both economic and noneconomic, as set forth above.

202. The aforesaid conduct of Defendants was committed with knowingly, conscious, and deliberate disregard for the rights and safety of residents in surrounding communities, including Plaintiffs, thereby entitling them to punitive damages in an amount appropriate to punish Defendants and deter them from similar conduct in the future.

203. Defendants' actions showed willful misconduct, malice, fraud, wantonness, and/or oppression, and raises the presumption of conscious indifference to the consequences.

WHEREFORE, Plaintiffs request that this Court impose punitive damages upon Defendants, together with interest, costs, attorneys' fees and all such other relief as the Court deems proper.

WILLIAMS CEDAR, LLC

Dated: October 27, 2020

*/s/ Alan H. Sklarsky*

Alan H. Sklarsky, Esquire

*/s/ Shauna L. Friedman*

Shauna L. Friedman, Esquire

## **DEMAND FOR JURY TRIAL**

      PLEASE TAKE NOTICE that Plaintiffs hereby demand trial by jury on all issues set forth herein.

                                        **WILLIAMS CEDAR, LLC**

Dated: October 27, 2020                       /s/ Alan H. Sklarsky

                                        Alan H. Sklarsky, Esquire

                      /s/ Shauna L. Friedman

                                        Shauna L. Friedman, Esquire

31

## CERTIFICATION PURSUANT TO L. Civ. R. 11.2

Undersigned counsel certifies that the following actions are pending involving the same

subject matter of this controversy:

1. Giordano, et al. v. Solvay Specialty Polymers, USA, LLC, et al. –
   Civ. Action No. 1:19-cv-21573;

2. Severa, et al. v. Solvay Specialty Polymers, USA, LLC, et al. –
   Civ. Action No. 1:20-cv-6906;

3. Bond, et al., v. Solvay Specialty Polymers, USA, LLC, et al. –
   Civ. Action No.: 1:20-cv-8487;

4. Slusser, et al. v. Solvay Specialty Polymers, USA, LLC, et al. –
   Civ. Action No.: 1:20-cv-11393
   Undersigned counsel further certifies that there are no additional known parties who

should be joined to the present action at this time.

Undersigned counsel further certifies that this case was also related to the subject matters

of the complaints captioned Minix, et al. v. Solvay Specialty Polymers, et al. – Civ. Action No.

1:14-cv-4405; Hazelton, et al. v. Solvay Chemicals, Inc., et al. – Civ. Action No. 1:14-cv-845;

and Thomas, et al. v. Solvay Chemicals, Inc., et al. – Civ. Action No. 1:14-cv-1870; but they

have since been resolved and are no longer pending before this Court.

I certify the foregoing to be true and I am aware that if any of the above is willfully false,

I am subject to punishment.

**WILLIAMS CEDAR, LLC**

Dated: October 27, 2020

/s/ Alan H. Sklarsky

Alan H. Sklarsky, Esquire

/s/ Shauna L. Friedman

Shauna L. Friedman, Esquire